**No. 12-17808**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

GEORGE K. YOUNG, JR.,

*Plaintiff-Appellant,*

v.

STATE OF HAWAII, ET AL.,

*Defendants-Appellees.*

Appeal from the United States District Court for the District of Hawaii,
No. 1:12-cv-00336-HG-BMK, Hon. Helen W. Gillmor

**BRIEF OF CORPUS LINGUISTICS PROFESSORS AND EXPERTS
AS AMICI CURIAE SUPPORTING APPELLEES**

JAMIE A. LEVITT
JANIE C. BUCKLEY
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019

BRIAN R. MATSUI
SAMUEL B. GOLDSTEIN
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue NW
Washington, DC 20006
Telephone: (202) 887-8784
BMatsui@mofo.com

*Counsel for Amici Curiae*

JUNE 4, 2020

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

INTEREST OF AMICI CURIAE ................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 2

ARGUMENT ........................................................................................ 4

I.   CORPUS LINGUISTICS OFFERS EMPIRICAL ANALYSES OF
     THE SECOND AMENDMENT'S ORIGINAL MEANING THAT
     WERE UNAVAILABLE WHEN THE COURT DECIDED *HELLER* ........ 5

     A.   Corpus Linguistics Relies On Databases That Are Vast,
          Diverse, And Neutral ............................................................. 6

     B.   Corpus Linguistics Uses Objective, Empirical Methodologies
          To Determine The Meaning Of Words And Phrases ..................... 11

II.  RECENT CORPUS LINGUISTICS RESEARCH INDICATES
     THAT THE ORIGINAL COMMON MEANING OF "BEAR ARMS"
     AND "KEEP ARMS" WAS COLLECTIVE AND MILITARISTIC ......... 14

     A.   "Bear Arms" Does Not Denote Individual Possession Of
          Firearms By Civilians .......................................................... 14

     B.   "Keep Arms" Does Not Denote Individual Possession Of
          Firearms By Civilians .......................................................... 21

CONCLUSION .................................................................................... 23

i

# TABLE OF AUTHORITIES

## Cases

*Caesars Entm't Corp. v. Int'l Union of Operating Eng'rs Local 68
    Pension Fund*,
    932 F.3d 91 (3d Cir. 2019) .......................................................................8, 11, 13

*Carpenter v. United States*,
    138 S. Ct. 2206 (2018) ........................................................................................11

*District of Columbia v. Heller*,
    554 U.S. 570 (2008).............................................................2, 3, 4, 5, 14, 15, 21

*English v. State*,
    35 Tex. 473 (1871)................................................................................................4

*Fire Ins. Exch. v. Oltmanns*,
    416 P.3d 1148 (Utah 2018) ...............................................................................11

*Lucia v. SEC*,
    138 S. Ct. 2044 (2018) ........................................................................................11

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010)........................................................................................2, 3, 4

*Muscarello v. United States*,
    524 U.S. 125 (1998)..............................................................................................7

*People v. Harris*,
    885 N.W.2d 832 (Mich. 2016)...........................................................................11

*Wilson v. Safelite Grp., Inc.*,
    930 F.3d 429 (6th Cir. 2019) ............................................................................11

*Young v. Hawaii*,
    896 F.3d 1044 (9th Cir. 2018) ............................................................................3

## Other Authorities

Alison L. LaCroix, *Historical Semantics and the Meaning of the Second Amendment*, The Panorama (Aug. 3, 2018), http://thepanorama.shear.org/2018/08/03/historical-semantics-and-the-meaning-of-the-second-amendment ............................ 6, 8, 14, 18, 19, 20, 21

Alison L. LaCroix & Jason Merchant, *Beyond Intuitions, Algorithms, and Dictionaries: Historical Semantics and Legal Interpretation*, Neubauer Collegium Workshop on Historical Semantics & Legal Interpretation, University of Chicago (May 22, 2017), https://home.uchicago.edu/~merchant/pubs/NeubauerLecture.pdf .............. 20, 21

*America's Historical Newspapers,* Readex, https://www.readex.com/content/americas-historical-newspapers ............................................. 9

*A Philosophical and Political History of the British Settlements and Trade in North America* (1776) ......................................... 19

COEME, https://lawncl.byu.edu/coeme ................................................. 16

COFEA, https://lawncl.byu.edu/cofea ................................................... 16

Dennis Baron, *Corpus Evidence Illuminates the Meaning of Bear Arms*, 46 Hastings Const. L.Q. 522 (2019) ......... 6, 14, 15, 16, 17, 18, 21, 22, 23

Douglas Biber, *Corpus-Based and Corpus-Driven Analyses of Language Variation and Use*, *in* The Oxford Handbook of Linguistic Analysis (Bernd Heine & Heiko Narrog eds., 2015) ..................... 6, 7

Douglas Biber et al., *Corpus Linguistics: Investigating Language Structure and Use* (1998) ................................................................. 13

James C. Phillips, Daniel M. Ortner & Thomas R. Lee, *Corpus Linguistics & Original Public Meaning: A New Tool To Make Originalism More Empirical*, 126 Yale L.J. Forum 21 (2016) ............... 7, 10, 11

Jeffrey P. Kaplan, *Unfaithful to Textualism*, 10 Geo. J.L. Pub. Pol'y 385 (2012) ................................................................................. 15, 16

Jennifer L. Mascott, *Who Are "Officers of the United States?"*, 70 Stan. L. Rev. 443 (2018) ......................................................... 10, 13

Jonathan Carver, *The New Universal Traveler* (1779) ............................................19

Josh Blackman & James C. Phillips, *Corpus Linguistics and the Second Amendment*, Harv. L. Rev. Blog (Aug. 7, 2018), https://blog.harvardlawreview.org/corpus-linguistics-and-the-second-amendment ..............................................................................5, 6, 21, 23

Lawrence M. Solan, *Can Corpus Linguistics Help Make Originalism Scientific?*, 126 Yale L.J. Forum 57 (2016)..........................................................7

Lawrence M. Solan & Tammy Gales, *Corpus Linguistics as a Tool in Legal Interpretation*, 2017 B.Y.U. L. Rev. 1311 (2017)....................................8

*Library Partners—Google Books*, Google, https://www.google.com/googlebooks/library/partners.html.........................................................9

Stefan Th. Gries, *Dispersions and Adjusted Frequencies in Corpora*, 13 Int'l J. Corpus Linguistics 403 (2008).............................................12

Stephen C. Mouritsen, *Hard Cases and Hard Data: Assessing Corpus Linguistics as an Empirical Path to Plain Meaning*, 13 Colum. Sci. & Tech. L. Rev. 156 (2011)................................................................10

Susan Hunston, *Corpora in Applied Linguistics* (2002).........................................12

Thomas Paine, *Common Sense* (1776) ...................................................18

Thomas R. Lee & Stephen C. Mouritsen, *Judging Ordinary Meaning*, 127 Yale L.J. 788 (2018) ............................................8, 11, 12, 13, 14

Tony McEnery & Andrew Wilson, *Corpus Linguistics: An Introduction* (2d ed. 2001) ...................................................................6

## INTEREST OF AMICI CURIAE[1]

Amici curiae are professors with an expertise in the fields of linguistics, law, and legal history. They file this brief on behalf of themselves as individuals, not as representatives of any institution.

Dennis E. Baron, Ph.D., is a Professor of English and Linguistics, emeritus, at the University of Illinois. Professor Baron has written extensively about language and grammar, and he is an expert in the areas of English language history and structure, the technologies of communication, and language and law. Professor Baron's recent work has focused on the use of corpus linguistics to understand the meaning of the Second Amendment.

Alison L. LaCroix, J.D., Ph.D., is the Robert Newton Reid Professor of Law at the University of Chicago Law School, and an Associate Member of the University of Chicago Department of History. Professor LaCroix is a scholar of American legal history, specializing in constitutional law, federalism, and eighteenth- and nineteenth-century legal thought. Professor LaCroix has also written about corpus linguistics and the study of Founding-era texts.

---

[1] Pursuant to Rule 29(a)(4)(E), amici affirm that no counsel for a party authored this brief in whole or in part and that no person other than amici or their counsel made any monetary contributions intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

Stefan Th. Gries, Ph.D., is a Professor of Linguistics in the Department of Linguistics at the University of California, Santa Barbara, and Chair of English Linguistics at the Justus-Liebig-Universität Giessen. Between 2013 and 2017, he was a Visiting Chair of the Centre for Corpus Approaches to Social Science at Lancaster University, and between 2007 and 2019, he was a Visiting Professor at five Linguistic Society of America Linguistic Institutes. Professor Gries publishes widely in quantitative corpus linguistics and has been involved in research and briefs on the ordinary meaning of words and phrases in legal texts.

Jason Merchant, Ph.D., is Vice Provost and the Lorna P. Straus Professor of Linguistics at the University of Chicago. Professor Merchant's primary research area is syntax and its interfaces with morphology and semantics. Professor Merchant has researched corpus linguistics applied to historical semantics and legal interpretation.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In challenging a longstanding limit on carrying firearms outside the home, plaintiff asks this Court to stretch the Second Amendment well beyond its textual and historical confines to cover a civilian "public carry" right. He relies on the survey of historical evidence the Supreme Court examined in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), including Founding-era legal treatises and nineteenth-century judicial

2

interpretations of the right to bear arms. Appellant's Opp. Reh'g En Banc 1 (citing *Young v. Hawaii*, 896 F.3d 1044, 1053-68 (9th Cir. 2018)). And from that review of history, he concludes that the Second Amendment encompasses a right to carry a firearm openly in public for self-defense. *Id.*

But any historical analysis is incomplete in light of recent findings in the field of corpus linguistics—none of which existed when the Supreme Court decided *Heller* and *McDonald* a decade ago. Corpus linguistics is an empirical approach to researching the use and meaning of language by surveying large collections of written or spoken texts, known as a corpus (singular) or corpora (plural). Recently, historians have assembled several voluminous new corpora containing American and English historical sources, which have allowed researchers for the first time to search for specific terms and phrases in hundreds of thousands of Founding-era texts. Using this new technology, corpus linguistics researchers have unearthed a wealth of new evidence demonstrating that the phrase "keep and bear arms" overwhelmingly had a collective, militaristic meaning at the Founding.

This new historical evidence undermines plaintiff's theory that the Second Amendment entitles citizens to brandish loaded firearms in public during peacetime for use against their fellow citizens in case of a confrontation. It cautions against expanding the right recognized in *Heller* to a "public carry" right. And it shows that

Hawaii's challenged licensing scheme comports with the Second Amendment's original meaning.

## ARGUMENT

The Court should reject plaintiff's assertion of a putative "right" to carry loaded firearms in public. After all, the Supreme Court has made clear that the Second Amendment does not protect an "unlimited" "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626; *McDonald*, 561 U.S. at 786 (plurality op.) (same). Far from it. History confirms "that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *Heller*, 554 U.S. at 626; *see English v. State*, 35 Tex. 473, 478-79 (1871) (finding it "little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute"—*e.g.*, "pistols"—given that "almost, if not every one of the states of this Union have a similar law"). And the need to respect these historical prohibitions has even more support today, given recent advancements in corpus linguistics. New research, which did not exist at the time of *Heller*, indicates that a civilian "public carry" right would not reflect the most common, natural meaning of "keep and bear arms" at the time of the Founding.

I.     **CORPUS LINGUISTICS OFFERS EMPIRICAL ANALYSES OF THE SECOND AMENDMENT'S ORIGINAL MEANING THAT WERE UNAVAILABLE WHEN THE COURT DECIDED *HELLER***

The Supreme Court has made clear that the Second Amendment's phrase "keep and bear arms" must be given the meaning it had to ordinary voters when it was ratified. *Heller*, 554 U.S. at 576-77. Yet in *Heller*, the Supreme Court admittedly could find "few examples" from "the founding period" to shed light on the meaning of "keep arms." *Id.* at 582. And although "bear arms" "was often used in a military context in the federal legal sources (such as records of congressional debate)," the Supreme Court observed that "[n]o dictionary has ever adopted that definition, and we have been apprised of no source that indicates that it carried that meaning at the time of the founding." *Id.* at 586-88. Thus, in the *Heller* Court's view, the Second Amendment's "text and history" left "no doubt" that the Amendment "conferred an individual right to keep and bear arms." *Id.* at 595.

In the decade since *Heller* was decided, however, the historical resources readily available to the field of corpus linguistics have expanded dramatically. Today, scholars can examine a far more extensive historical record in ways that were "technologically *impossible* in 2008 when *Heller* was decided." Josh Blackman & James C. Phillips, *Corpus Linguistics and the Second Amendment*, Harv. L. Rev.

Blog (Aug. 7, 2018).[2]  Indeed, corpus linguistics has enhanced the historical and linguistic understanding of the Second Amendment's text by allowing researchers to analyze vast quantities of newly digitized historical texts from the Founding era. *Id.*  Those texts contain copious examples of "keep arms" and "bear arms" in everyday written speech when the Second Amendment was ratified—nearly all of which involve collective, military-based uses of arms.  Dennis Baron, *Corpus Evidence Illuminates the Meaning of Bear Arms*, 46 Hastings Const. L.Q. 522, 510-13 (2019); Alison L. LaCroix, *Historical Semantics and the Meaning of the Second Amendment*, The Panorama (Aug. 3, 2018).[3]

## A.    Corpus Linguistics Relies On Databases That Are Vast, Diverse, And Neutral

Corpus linguistics is "the study of language based on examples of 'real life' language use."  Tony McEnery & Andrew Wilson, *Corpus Linguistics: An Introduction* 1 (2d ed. 2001).  "[D]eveloped over the past several decades to support empirical investigations of language variation and use," corpus linguistics uses "both quantitative and qualitative analytical techniques" to study "a large and principled collection of natural texts, known as a 'corpus.'"  Douglas Biber, *Corpus-Based and Corpus-Driven Analyses of Language Variation and Use*, *in* The Oxford Handbook

---

[2]    https://blog.harvardlawreview.org/corpus-linguistics-and-the-second-amendment.

[3]    http://thepanorama.shear.org/2018/08/03/historical-semantics-and-the-meaning-of-the-second-amendment.

of Linguistic Analysis 193-95 (Bernd Heine & Heiko Narrog eds., 2015).  Applying those methods to a corpus or corpora produces "research findings that have much greater generalizability and validity than would otherwise be feasible."  *Id.*

"A corpus, in linguistic terms, is merely a searchable body of texts used to determine meaning through language usage."  James C. Phillips, Daniel M. Ortner & Thomas R. Lee, *Corpus Linguistics & Original Public Meaning:  A New Tool To Make Originalism More Empirical*, 126 Yale L.J. Forum 21, 24 (2016).  "Lawyers use corpora on a daily basis.  In a sense, Google and Westlaw or Lexis are corpora." *Id.*; *see Muscarello v. United States*, 524 U.S. 125, 129 (1998) ("[W]e have surveyed modern press usage, albeit crudely, by searching computerized newspaper databases.").  "But a linguist-designed corpus is more than just a big database. Because linguist-designed general corpora have a balance of different genres of texts, one can obtain a more representative slice of language usage and meaning." Phillips, Ortner & Lee, *supra*, at 24.

More importantly, "the corpus is neutral in the sense that those whose writing contributes to it had no agenda with respect to the constitutional debates that occur now, some 250 years after the texts were written."  Lawrence M. Solan, *Can Corpus Linguistics Help Make Originalism Scientific?*, 126 Yale L.J. Forum 57, 59 (2016). As Judge Hardiman recently explained, courts "can use corpora to perform analyses unavailable in standard sources like dictionaries.  These analyses include measuring,

in a given speech community over a given time, the statistical frequency of a word and the linguistic contexts in which it appears." *Caesars Entm't Corp. v. Int'l Union of Operating Eng'rs Local 68 Pension Fund*, 932 F.3d 91, 95 n.1 (3d Cir. 2019). Indeed, by analyzing the use of a word or phrase in these corpora, courts and researchers can gather objective, empirical information about "which meanings were possible at a given time, and what their relative distribution and frequency were." LaCroix, *supra*.

Corpora generally come in one of two types: "general and specialized." Lawrence M. Solan & Tammy Gales, *Corpus Linguistics as a Tool in Legal Interpretation*, 2017 B.Y.U. L. Rev. 1311, 1337 (2017). General corpora are usually "large (frequently millions to billions of words) and usually aim to capture a range of registers that are representative of a common language variety." *Id.*; *see* Thomas R. Lee & Stephen C. Mouritsen, *Judging Ordinary Meaning*, 127 Yale L.J. 788, 830 (2018) ("A *general* corpus endeavors to represent the language used by a broad (often national) speech community."). Specialized corpora, by contrast, "are typically smaller (frequently thousands to millions of words) and focus on a more specific or less accessible variety of language." Solan & Gales, *supra*, at 1337; *see* Lee & Mouritsen, *supra*, at 830-31 & n.180 (special corpora are often "limited to a particular genre, register, or dialect," *e.g.*, "a corpus of recorded Egyptian Arabic telephone calls").

Today, corpus linguistics relies on various databases comprising a multitude of different and varied sources. Important research has been performed, for example, on Google Books, a corpus containing more than 25 million sources digitized in partnership with over 40 libraries, including Columbia University, Harvard University, the New York Public Library, and Oxford University.[4] The same is true of Readex, a corpus of early American newspapers dating back to 1690 curated by a "distinguished academic advisory board" in "partnerships with the American Antiquarian Society, the Library of Congress, the Wisconsin Historical Society and more than 90 other institutions."[5]

Additionally, Brigham Young University recently unveiled two groundbreaking corpora: the Corpus of Founding Era American English ("COFEA") and the Corpus of Early Modern English ("COEME"). COFEA includes over 120,000 texts and 154 million words drawn from sources between 1760 and 1799, and COEME includes 40,000 texts and close to 1.3 billion words from sources dating back to 1475. Specifically, COFEA contains: (1) The National Archive Founders Online, which contains over 90,000 records, including documents from Washington, Franklin, Adams, Jefferson, Hamilton, and Madison;

---

[4] *Library Partners—Google Books*, Google, https://www.google.com/googlebooks/library/partners.html.

[5] *America's Historical Newspapers,* Readex, https://www.readex.com/content/americas-historical-newspapers.

(2) HeinOnline, which includes federal and state statutes, executive reports, and Founding-era treatises; (3) Evans Early American Imprints, which contains over 3000 written documents from 1760 and 1799; (4) Elliot, The Debates in the State Conventions on the Adoption of the Federal Constitution; (5) Farrand, Records of the Federal Constitutional Convention of 1787; (6) United States Statutes-at-Large from the first five Congresses.

As commentators have observed, "[t]he use of a corpus-like database to do originalist research is not new. After all, combing through the debates on the federal convention or the Federalist Papers is a form of corpus-based originalism." Phillips, Ortner & Lee, *supra*, at 27 (citing Randy E. Barnett, *New Evidence of the Original Meaning of the Commerce Clause*, 55 Ark. L. Rev. 847, 856-62 (2003), which surveyed uses of the term "commerce" in the Pennsylvania Gazette from 1728 to 1800). Still, as recently as 2011, corpus-based techniques had "rarely been brought to bear on the legal question of ordinary meaning." Stephen C. Mouritsen, *Hard Cases and Hard Data: Assessing Corpus Linguistics as an Empirical Path to Plain Meaning*, 13 Colum. Sci. & Tech. L. Rev. 156, 161-62 & n.21 (2011).

But all that has changed now that courts and researchers can analyze the use of language in hundreds of thousands of Founding-era sources. Jennifer L. Mascott, *Who Are "Officers of the United States?"*, 70 Stan. L. Rev. 443, 466-67 (2018) ("More tools than ever before are at the disposal of originalist interpreters with the

recent adaptation of corpus linguistics techniques to constitutional and statutory interpretation."). And of particular relevance here, corpora, "usually tens or hundreds of millions of words in size, can help with the small sample sizes that have usually plagued originalist research." Phillips, Ortner & Lee, *supra*, at 24. Corpus linguistics thus provides a potentially indispensable tool for understanding the Constitution's original meaning. *Carpenter v. United States*, 138 S. Ct. 2206, 2238-39 (2018) (Thomas, J., dissenting) (citing corpus linguistics research from COFEA, Google Books, and Readex); *Lucia v. SEC*, 138 S. Ct. 2044, 2056-57 (2018) (Thomas, J., concurring) (citing corpus linguistics research in Mascott, *supra*).[6]

## B. Corpus Linguistics Uses Objective, Empirical Methodologies To Determine The Meaning Of Words And Phrases

Corpus linguistics uses a variety of objective, empirical methods to perform "tasks that cannot be performed by human linguistic intuition alone." Lee &

---

[6] *See, e.g.*, *Caesars*, 932 F.3d at 95 n.1 ("Corpus linguistics describes language empirically."); *People v. Harris*, 885 N.W.2d 832, 838-39 & n.29 (Mich. 2016) (using "*corpus linguistics*" as "a tool that can aid in the discovery of 'how particular words or phrases are actually used in written or spoken English'"); *Fire Ins. Exch. v. Oltmanns*, 416 P.3d 1148, 1163 n.9 (Utah 2018) (Durham, J., concurring in part, concurring in the result) ("In the field of corpus linguistics, scholars determine those meanings that are consistent with common usage, or the term's ordinary or most frequent meaning based on empirical data rather than personal intuition." (quotations and alterations omitted)); *Wilson v. Safelite Grp., Inc.*, 930 F.3d 429 (6th Cir. 2019) (Thapar, J., concurring in part, concurring in the judgment) ("[C]orpus linguistics can help courts as they roll up their sleeves and grapple with a term's ordinary meaning.").

Mouritsen, *supra*, at 831-32. Chief among these are *frequency*, *collocation*, and *keywords in context*.

*Frequency.* Measuring the frequency of a word or phrase in a particular context is perhaps the most common tool for analyzing the meaning of language in corpus linguistics. Stefan Th. Gries, *Dispersions and Adjusted Frequencies in Corpora*, 13 Int'l J. Corpus Linguistics 403 (2008). Frequency can show, among other things, "the importance of particular words/grammatical patterns" and "the degree of cognitive entrenchment of particular words/grammatical patterns." *Id.* That is, by measuring "the statistical *frequency* of words and word senses in a given speech community and over a given time period," researchers can "determine empirically" whether "the ordinary meaning of a given word" is merely "*possible, common*, or the *most common* sense of that word in a given context." Lee & Mouritsen, *supra*, at 831-32. Hence, corpus linguistics can shed considerable light on whether the phrase "keep and bear arms" was most commonly understood at the Founding to confer an individual right by studying the frequency with which its terms are used and in what contexts.

*Collocation.* This method is used to study "the tendency of words to be biased in the way they co-occur." Susan Hunston, *Corpora in Applied Linguistics* 68 (2002). Collocation analyzes the statistical frequencies of the appearance of two or more words together in a particular context (*e.g.*, "keep arms" or "bear arms" in the

context of military service). It thus reveals "the possible range of linguistic contexts in which a word typically appears and can provide useful information about the range of possible meanings and sense divisions." Lee & Mouritsen, *supra*, at 832; *see Caesars*, 932 F.3d at 95 (using "collocates" method to find "the words that most often co-occurred with 'previously'").

***Keywords in context.*** Often referred to as "KWIC," this tool "allows a corpus user to evaluate words in context systematically" by reviewing "a particular word or phrase in hundreds of contexts, all on the same page of running text." Lee & Mouritsen, *supra*, at 832. "The core idea underlying KWIC analysis is to examine the context surrounding uses of the term or phrase under review as the term was actually employed in spoken or written English during the relevant time period." Mascott, *supra*, at 467 (describing KWIC as a "corpus linguistics technique" that is "particularly relevant to statutory and constitutional interpretation"). So, for example, analysts can use the KWIC function to learn how the terms "keep" and "bear" were used in the context of firearms and other weapons at the time of the Founding. In doing so, KWIC analysis illuminates "the occurrences of a chosen word with its surrounding context." Douglas Biber et al., *Corpus Linguistics: Investigating Language Structure and Use* 26 (1998).

In sum, by enabling systematic analyses of language in historical texts, corpus linguistics provides "meaningful and quantifiable insight about the range of possible

uses of a word and the frequency of its different senses." Lee & Mouritsen, *supra*, at 832.

## II. RECENT CORPUS LINGUISTICS RESEARCH INDICATES THAT THE ORIGINAL COMMON MEANING OF "BEAR ARMS" AND "KEEP ARMS" WAS COLLECTIVE AND MILITARISTIC

Newly available corpus-linguistics evidence cautions against expanding the Second Amendment to entitle civilians to carry loaded guns in public places whenever they choose.

### A. "Bear Arms" Does Not Denote Individual Possession Of Firearms By Civilians

Consistent with its military origins, the phrase "bear arms" has a collective connotation, typically referring to "the act of soldiering and the use of weapons in war." Baron, *supra*, at 513; LaCroix, *supra*. The Supreme Court read the phrase differently in *Heller*, but it did so largely based on the paucity of the extant historical record. *See* 554 U.S. at 586-88 ("[W]e have been apprised of no source that indicates that it carried that meaning at the time of the founding.").

Since *Heller* was decided, however, corpus-linguistics researchers have discovered a voluminous body of evidence reinforcing the collective, militaristic meaning of "bear arms." Baron, *supra*, at 513; *LaCroix*, *supra*. This research suggests, at the very least, that greater emphasis should be afforded the Second Amendment's "prefatory" language—"A well regulated Militia, being necessary to the security of a free State"—since the principal basis for subordinating that clause

14

in *Heller* was the purportedly unambiguous individual connotation of "keep and bear arms." Jeffrey P. Kaplan, *Unfaithful to Textualism*, 10 Geo. J.L. Pub. Pol'y 385, 414, 426 (2012) (explaining that, linguistically, the prefatory clause or "absolute provides the basis for the guarantee of the main clause").

Consider, for example, COFEA and COEME. A survey of those corpora revealed that both legal and non-legal texts in the Founding-era "almost always use *bear arms* in an unambiguously military sense." Baron, *supra*, at 510-11. Out of nearly 1,000 examined uses of "bear arms" in "seventeenth- and eighteenth-century English and American texts," "roughly 900 separate occurrences of *bear arms* before and during the founding era refer to war, soldiering, or other forms of armed action by a group rather than an individual." *Id.* Representative examples include—

- "Let us consider those that *bear ARMS* under our PRINCES, with how much Order and Submission they execute their Command." [1748].

- "The number of the Enemies that *bear Arms*, according to the truth, was about forty thousand more or less." [1700].

- "I may say with truth all Weymouth, Braintree, Hingham, who were able to *bear Arms*, and hundreds from other Towns within 20, 30, and 40 miles of Weymouth." [1775].

- "[T]hat Numbers of the Inhabitants murmur at being Obliged to *bear Arms*; and the dread of a French War is very General." [1777].

15

- "[A]ll male persons, from sixteen years of age to fifty, shall *bear arms*, and duly attend all musters, and military exercise of the respective troops and companies."  [1760].

- "Those who conscienciously scruple to *bear arms*, shall not be compelled to do so; but shall pay an equivalent for personal service."  [1792].

*Id.* at 511 (citing COFEA and COEME, BYU Law & Corpus Linguistics).[7]

By contrast, only a handful of results from those corpora "were either ambiguous or carried no military connotation."  *Id.* at 510-11.  In fact, "bear arms" was used only *once* in a clearly non-military context—an English *translation* of the French term "*porter armes*," used to describe orangutans in 1780:  "[A]n ape who knows how to *bear arms*, to attack his enemies with stones, and to defend himself with clubs."  *Id.* at 512.  Otherwise, the remaining examples "are at best ambiguous, as they appear in contexts suggesting a military or quasi-military sense of bearing arms."  *Id.*  Those examples include—

- "That no person shall use or *bear any Arms* within London, and the Suburbs, or in any place between the said City and Pallace of Westminster, nor in no other part of the Pallace by Land or by Water, except such of the Kings people, as he shall appoint to keep the Kings peace."  [1657].

---

[7] COFEA, https://lawncl.byu.edu/cofea; COEME, https://lawncl.byu.edu/coeme.

16

- "[The 1689 Bill of Rights] asserted the freedom of election to parliament, the freedom of speech in parliament, and the right of the subject to *bear arms*, and to petition his sovereign."  [1771].

- "A Peasant in this Country (unless in time of great Danger or Invasion) is not suffered to *bear Arms*."  [1689].

- "That every Person who will go for Ireland on these Conditions, shall out of his first share of Money, buy for himself and every Relation and Servant that he carries with him (who are able to *bear Arms*,) a good Musket, or Case of Pistols for the defence of his Family."  [1690].

- "That the People have a Right to *bear Arms* for the Defence of themselves and the State, and as standing Armies in the Time of Peace are dangerous to Liberty, they ought not to be kept up:  And that the Military should be kept under strict Subordination to, and governed by, the Civil Power."  [1776].

- "To protect the people against the violence of those who *bear arms* [*i.e.*, officers and gentlemen who carry their swords in peacetime], and to punish them severely, if they shall dare to insult them, might still be, as it is at present, the business of the magistrate."  [1787].

*Id.* at 512-13; *see id.* at 518-22 (discussing these examples in greater detail "to show their ambiguity, their relation to the normal, military sense of *bear arms*, and their appearance in the context of weapons regulation").

17

In sum, "[n]on-military uses of *bear arms* in reference to hunting or personal self-defense are not just rare, they are almost nonexistent." *Id.* at 510. This evidence confirms "that the plain, ordinary, natural, and original meaning of *bear arms* in the eighteenth century was 'carrying weapons in war,' or in other forms of group offense, defense, or rebellion." *Id.*

Nearly identical evidence is found in other corpora. Publications from 1760 to 1795 in Google Books revealed that "bear arms" was used 67.4% of the time in a collective rather than an individual sense. LaCroix, *supra*. This includes using "bear arms" in a collective sense with a plural subject (*e.g.*, "Slaves were not permitted to *bear arms*"), as well as using the phrase in a collective sense with a singular subject (*e.g.*, "when a slave was made free, a spear was put into his hand, and he was thenceforward permitted to *bear arms*, and subjected to military services"). *Id.* (quoting 4 Robert Henry, *The History of Great Britain* 142 (2d ed. 1788)). Other representative examples include—

- "Wherefore, if ye really preach from conscience, and mean not to make a political hobby-horse of your religion, convince the word thereof, by proclaiming your doctrine to our enemies, for they likewise *bear arms*." Thomas Paine, *Common Sense* (1776).

- "In this town is a barrack for two companies of foot; and at the arrays in 1746, here were a thousand protestants fit to *bear arms*." Jonathan Carver, *The New Universal Traveler* (1779).

- "[H]e is exposed to the scorching heat of the sun, the intense frosts of the night, or the bloody slings of insects, he would be declare incapable and unworthy to *bear arms*. Are our militias and armies formed in this manner?" *A Philosophical and Political History of the British Settlements and Trade in North America* 38 (1776).

By contrast, researchers found no evidence that similar language was used in the individual sense of "bear an arm" or "bear a weapon." To be sure, the phrase "bear arms" was on rare occasion used in an individual sense with a singular subject (*e.g.*, "I'll fire his blood by telling what I did/When I was strong, and able to *bear arms*"). LaCroix, *supra* (quoting Samuel Johnson, *The Works of English Poets* (1779)). Yet no corpus evidence from the Founding era indicated that "bear" had an individualized connotation in the context of firearms generally, revealing no instances of any of the following phrases—

- "Bear a rifle"

- "Bear a musket"

- "Bear a pistol"

- "Bear a knife"

19

- "Bear rifles"

- "Bear muskets"

- "Bear pistols"

The results from early American newspapers in Readex "are even more dramatic." LaCroix, *supra*. Those sources revealed that more than 86% of the uses of "bear arms" in newspapers between 1760 and 1795 were collective. Alison L. LaCroix & Jason Merchant, *Beyond Intuitions, Algorithms, and Dictionaries: Historical Semantics and Legal Interpretation*, Neubauer Collegium Workshop on Historical Semantics & Legal Interpretation, University of Chicago (May 22, 2017).[8] In stark contrast, individual uses with a singular subject accounted for less than 12% of known uses of "bear arms" in those same newspapers, as shown in the chart below—



---

[8] https://home.uchicago.edu/~merchant/pubs/NeubauerLecture.pdf.

*Id.* "For most ordinary citizens in the founding generation, then, the phrase 'bear arms' referred to an activity undertaken by groups of people, not only by individuals." LaCroix, *supra*.

The data derived from these historical texts, both legal and non-legal, suggest the phrase "bear arms" referred to militias rather than solo use of weapons for self-defense. At the very least, the data call into question *Heller*'s conclusion that the phrase's clear meaning referred to carrying weapons outside of an organized militia. *Heller*, 554 U.S. at 586-88. In light of this evidence, the Court should not distort the Second Amendment's original meaning by declaring an unbounded right for civilians to carry loaded guns in public during peacetime.

## B. "Keep Arms" Does Not Denote Individual Possession Of Firearms By Civilians

The same is true of "keep arms." The *Heller* Court noted that "'keep arms' was not prevalent in the written documents of the founding period that we have found." 554 U.S. at 582. But corpus linguistics has greatly expanded the historical record. Blackman & Phillips, *supra* (recognizing *Heller* "suffered from a lack of access to a large enough corpus to answer the linguistic questions presented" and the Court "implicitly recognized the deficiency of studying a limited range of materials").

Corpus evidence reveals that in Founding-era sources "keep arms" "almost always appears in a military context." Baron, *supra*, at 513. The phrase appeared

twenty-eight times in COEME and ten times in COFEA, and after excluding duplicates and irrelevant entries (*e.g.*, where "keep" meant "prevent"), researchers found that twenty-five of the remaining examples "refer to weapons for use in the military or the militia." *Id.* Representative examples include—

- "It now being thought not necessary to view the arms and ammunition of those obliged to *keep arms* more than once a year." [1776].

- "Companies being notified by their respective commanding Officers that he is about to lead them . . . and in Case of the Infantry, the householders, and others by Law obliged to *keep Arms*, at least three Days before such Choice." [1776].

- "An armory to *keep arms* for the defence of the place." [1688].

- "[Freemen] were bound to follow their Lords to the Wars, and many were Voluntiers, yet it seems all were bound upon call under peril of Fine and were bound to *keep Arms* for the preservation of the Kingdom, their Lords, and their own persons." [1689].

- "[Protestants] were bound to *keep Arms* and Defend themselves and their Country from the power of the Popish Natives which were then Armed against them." [1691].[9]

---

[9] Research on file with Professor Baron.

This evidence, showing that "keep arms" was used "almost exclusively in a military context" at the Founding, reinforces the Second Amendment's military connotation. *Id.*

Other analysts have uncovered similar evidence. Professors Blackman and Phillips found "roughly 200 results" in COFEA of "the word 'keep' (and its variants, 'keeping,' 'kept,' etc.) within four words of 'arm' or 'arms.'" Blackman & Phillips, *supra*. After omitting irrelevant results and duplicates, they found that, of the eighteen texts they reviewed, "about half referred to keeping arms in the military context, roughly a quarter referred to a private sense of keeping arms, and another quarter or so were ambiguous references." *Id.* This evidence likewise provides reason to question *Heller*'s reading of "keep arms," and at the very least it cautions against transforming a right to "keep arms" into a right to brandish firearms in public during peacetime.

## CONCLUSION

The district court's judgment should be affirmed.

Dated:  June 4, 2020                     Respectfully submitted,

                                         s/ Brian R. Matsui

JAMIE A. LEVITT                          BRIAN R. MATSUI
JANIE C. BUCKLEY                         SAMUEL B. GOLDSTEIN
MORRISON & FOERSTER LLP                  MORRISON & FOERSTER LLP
250 West 55th Street                     2000 Pennsylvania Avenue NW
New York, NY 10019                       Washington, DC 20006
                                         Telephone: (202) 887-8784
                                         BMatsui@mofo.com

        *Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with Ninth Circuit Rule 29-2(c)(3) because it contains 4,997 words excluding those parts authorized by Fed. R. App. P. 27(a)(2)(B) and 32(f).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Office Word 2016 in 14-point Times New Roman font.

Dated: June 4, 2020          s/ Brian R. Matsui

                                     Brian R. Matsui

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system on June 4, 2020.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


Dated:  June 4, 2020                               s/ Brian R. Matsui
                                                  Brian R. Matsui


ny-1917796