No. 12-17808

# In the
# United States Court of Appeals
# for the Ninth Circuit

◆

GEORGE K. YOUNG, JR.,

*Plaintiff–Appellant,*

v.

STATE OF HAWAII, et al.,

*Defendants–Appellees.*

◆

On Appeal from the United States District Court
for the District of Hawaii
Case No. 1:12-cv-00336-HG-BMK

◆

**BRIEF OF *AMICI CURIAE* PROFESSORS OF SECOND
AMENDMENT LAW, FIREARMS POLICY COALITION, FIREARMS
POLICY FOUNDATION, CATO INSTITUTE, MADISON SOCIETY
FOUNDATION, CALIFORNIA GUN RIGHTS FOUNDATION,
SECOND AMENDMENT FOUNDATION, AND INDEPENDENCE
INSTITUTE IN SUPPORT OF APPELLANT AND REVERSAL**

◆

DAVID B. KOPEL
INDEPENDENCE INSTITUTE
727 East 16th Avenue
Denver, CO 80203
(303) 279-6536
david@i2i.org

JOSEPH G.S. GREENLEE
*Counsel of Record*
FIREARMS POLICY COALITION
1215 K Street, 17th Floor
Sacramento, CA 95814
(916) 378-5785
jgr@fpchq.org

ILYA SHAPIRO
TREVOR BURRUS
CATO INSTITUTE
1000 Mass. Ave. NW
Washington, DC 20001
(202) 842-0200
ishapiro@cato.org

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *Amici Curiae* make the following statements:

**Firearms Policy Coalition** has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

**Firearms Policy Foundation** has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

**Cato Institute** has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

**Madison Society Foundation** has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

**California Gun Rights Foundation** has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

**Second Amendment Foundation** has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

**Independence Institute** has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

/s/ *Joseph G.S. Greenlee*
*Counsel of Record*

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF CONTENTS ................................................................. ii

TABLE OF CITED AUTHORITIES ............................................... iv

STATEMENT OF *AMICI CURIAE* ................................................. 1

CONSENT TO FILE ...................................................................... 3

SUMMARY OF ARGUMENT ........................................................ 4

ARGUMENT ............................................................................... 5

  I.  The Second Amendment's text protects the right to bear arms as emphatically as the right to keep arms. ........................................ 5

    A.  The Second Amendment's text places "bear" on equal footing with "keep." ...................................................................... 5

    B.  Contemporary dictionaries defined "bear" to mean "carry." ... 6

    C.  The right to bear arms is not limited to military uses. ........... 8

  II.  The right of law-abiding citizens to carry arms in public was unrestricted throughout the colonial and founding eras. ............ 14

  III.  Throughout the colonial and founding eras, citizen arms carrying was ordinary, not "terrifying." ...................................................... 16

    A.  Virginia ...................................................................... 17

    B.  Massachusetts Bay ...................................................... 18

    C.  Plymouth ................................................................... 19

    D.  Connecticut ................................................................ 20

    E.  Rhode Island .............................................................. 20

    F.  Maryland ................................................................... 20

    G.  South Carolina ........................................................... 21

    H.  Georgia ...................................................................... 21

  IV.  The Founders regularly carried arms in their everyday lives. .... 22

    A.  John Adams ................................................................ 22

    B.  Thomas Jefferson ....................................................... 22

    C.  James Monroe ............................................................ 23

  D.  Ira Allen and Ethan Allen ...................................................... 24

  E.  Joseph Warren ...................................................................... 25

  F.  William Drayton .................................................................. 26

  G.  General Population ............................................................... 26

CONCLUSION ....................................................................................... 28

APPENDIX ............................................................................................ 29

CERTIFICATE OF COMPLIANCE ..................................................... 34

CERTIFICATE OF SERVICE .............................................................. 35

# TABLE OF CITED AUTHORITIES

## Cases

*Andrews v. State*,
   50 Tenn. 165 (1871) .............................................................. 16

*Caetano v. Massachusetts*,
   136 S. Ct. 1027 (2016) ........................................................... 8

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) .................................................... *passim*

*Gibbons v. Ogden*,
   22 U.S. (9 Wheat.) 1 (1824) .................................................. 6

*McDonald v. Chicago*,
   561 U.S. 742 (2010) ................................................ 9, 13, 14

*Moore v. Madigan*,
   702 F.3d 933 (7th Cir. 2012) ................................................ 9

*Muscarello v. United States*,
   524 U.S. 125 (1998) ............................................................... 7

*Nunn v. State*,
   1 Ga. 243 (1846) ................................................................. 16

*United States v. Sprague*,
   282 U.S. 716 (1931) ............................................................... 7

*Wrenn v. District of Columbia*,
   864 F.3d 650 (D.C. Cir. 2017) .............................................. 6

## Constitutional Provisions

U.S. Const. amend. II ..................................................... *passim*

## Statutes and Regulations

Act of July 16, 1866, §14, 14 Stat. 176-77 ............................... 14

## Other Authorities

*A Bill for Preservation of Deer (1785)* ................................................. 9, 10

Allen, Ira, NATURAL AND POLITICAL HISTORY OF THE STATE OF VERMONT (1798) .............................................................................................. 25

AMERICAN ARCHIVES, 4th ser., vol. 3 (Peter Force ed., 1840) ................ 26

ARCHIVES OF MARYLAND (1885) .................................................... 21

BLACKSTONE'S COMMENTARIES (1803) .................................................. 27

Burlamaqui, Jean-Jacques, 2 THE PRINCIPLES OF NATURAL AND POLITIC LAW (Thomas Nugent trans., 2d ed. 1763) ......................................... 13

DIARY AND AUTOBIOGRAPHY OF JOHN ADAMS (1961) ............................... 22

Frothingham, Richard, LIFE AND TIMES OF JOSEPH WARREN (1865) ...... 26

Grotius, Hugo, 2 THE RIGHTS OF WAR AND PEACE (Richard Tuck ed., 2005) (1625) .............................................................................. 11

Hening, William Waller, 1 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA (1809) .............................. 18

Johnson, Samuel, 1 DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 1773) .................................................................................... 7, 8

Kopel, David B. & Greenlee, Joseph G.S., *The Second Amendment Rights of Young Adults*, 43 S. ILL. U.L.J. 495 (2019) ......................... 17

Lederer, Jr., Richard, COLONIAL AMERICAN ENGLISH (1985) ................. 15

Letter from the Hon. Harrison G. Otis, to the Hon. William Heath, as Chairman of the Roxbury Committee, for Petitioning Congress, Against Permitting Merchant Vessels to Arm (Apr. 1798) ................. 14

Locke, John, SECOND TREATISE OF GOVERNMENT (1690) ....................... 10

McCord, David, 7 STATUTES AT LARGE OF SOUTH CAROLINA (1840) ........ 21

McCullough, David, JOHN ADAMS (2001) ............................................ 22

v

McGrath, Tim, James Monroe: A Life (2020) ......................................24

Order Denying Motion of Neal Goldfarb for Leave to Participate in Oral
  Argument as Amicus Curiae and For Divided Argument, *New York
  State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 398
  (mem.) (Oct. 15, 2019)............................................................9

Proceedings of the Virginia Assembly, 1619 ........................................17

Public Records of the Colony of Connecticut (1850).....................20

Pufendorf, Samuel, *Of the Right of War*, *in* Of the Law of Nature
  and Nations (The Lawbook Exchange 2005) (1672) ..........................13

Records of the Colony and Plantation of New Haven, From
  1638 to 1649 (1857) ...............................................................20

Records of the Colony of Rhode Island and Providence
  Plantations, in New England (1856)...................................20

Records of the Governor and Company of the Massachusetts
  Bay in New England (1853)..............................................19

Selections from Three Works of Francisco Suárez, S.J. (Gwladys
  Williams ed., 1944) ...............................................................12

Suárez, Francisco, De Triplici Virtute Theologica, Fide, Spe, et
  Charitate (1621) ..................................................................12

The Annual Register, or a View of the History, Politics, and
  Literature, for the Year 1766 (4th ed., 1785) .................................27

The Colonial Records of the State of Georgia (1904) .....................21

The Compact with the Charter and Laws of the Colony of New
  Plymouth (1836) ...................................................................19

The Grants, Concessions, and Original Constitutions of the
  Province of New-Jersey (1758).........................................15

The Papers of Thomas Jefferson (J. Boyd ed., 1950) ...............9, 10, 23

THE PAPERS OF THOMAS JEFFERSON, RETIREMENT SERIES (2004) ........... 23

Tyler, Lyon Gardiner, 5 NARRATIVES OF EARLY VIRGINIA, 1606-25 (1907) ........................................................................................ 17

Victoria, Francisco De, 2 DE INDIS ET DE IURE BELLI RELECTIONES (Ernest Nys ed., John Pawley Bates trans., 1995) (1532) ................. 11

VIRGINIA LAWS 1661-1676 (1676) ........................................................... 18

Webb, George, THE OFFICE AND AUTHORITY OF A JUSTICE OF PEACE (1736) ........................................................................................ 16

Webster, Noah, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) .................................................................................... 8, 10

Wilbur, J., 1 IRA ALLEN: FOUNDER OF VERMONT, 1751-1814 (1928) ................................................................................... 24, 25

## STATEMENT OF *AMICI CURIAE*

*Amici* **professors** are law professors who teach and write on the Second Amendment: Randy Barnett (Georgetown), Royce Barondes (Missouri), Robert Cottrol (George Washington), Nicholas Johnson (Fordham), Donald Kilmer (Lincoln), Joyce Malcolm (George Mason), George Mocsary (Wyoming), Joseph Olson (Mitchell Hamline), Glenn Reynolds (Tennessee), and Gregory Wallace (Campbell). As the Appendix describes, they were cited by the Supreme Court in *District of Columbia v. Heller* and *McDonald v. Chicago*. Oft-cited by lower courts as well, these professors include authors of the first law school textbook on the Second Amendment, and many other books and law review articles on the subject.

**Firearms Policy Coalition** is a nonprofit organization that defends constitutional rights through advocacy, research, legal efforts, outreach, and education.

**Firearms Policy Foundation** is a nonprofit organization that serves its members and the public through charitable programs including research, education, and legal efforts.

**Cato Institute** is a nonpartisan public policy research foundation that advances the principles of individual liberty, free markets, and limited government.

**Madison Society Foundation** is a nonprofit corporation that supports the right to arms by offering education and training to the public.

**California Gun Rights Foundation** is a nonprofit organization that focuses on educational, cultural, and judicial efforts to advance civil rights.

**Second Amendment Foundation (SAF)** is a nonprofit foundation dedicated to protecting the Second Amendment through educational and legal programs. SAF organized and prevailed in *McDonald v. Chicago*, 561 U.S. 742 (2010).

**Independence Institute** is a nonpartisan public policy research organization. The Institute's *amicus* briefs in *Heller* and *McDonald* (under the name of lead amicus Int'l Law Enforcement Educators & Trainers Association (ILEETA)) were cited in the opinions of Justices Breyer (*Heller*), Alito (*McDonald*), and Stevens (*McDonald*).

This case concerns *amici* because it goes to the heart of the fundamental right of the people to bear arms for self-defense, as protected by the United States Constitution.

## CONSENT TO FILE

All parties have consented to the filing of this brief.[1]

---

[1] No counsel for a party authored this brief in whole or part. No party or counsel for a party contributed money to fund the brief's preparation or submission. Only *amici* contributed money intended to fund the brief's preparation or submission.

## SUMMARY OF ARGUMENT

The Second Amendment protects the right to keep arms and the right to bear arms. Neither right is inferior. The only historical laws that *Heller* denounced for matching the severity of the District of Columbia's ban on keeping handguns were bans on carrying handguns openly. As dictionaries from the founding era attest, to "bear arms" includes carrying arms for personal defense and other lawful purposes.

Some of Defendants' *amici* assert that "bear arms" is exclusively military. James Madison and Thomas Jefferson thought the opposite and proposed a bill to the Virginia legislature using "bear a gun" in expressly nonmilitary contexts. "Bear arms" does sometimes appear in sentences with words like "war," but self-defense was considered a type of "war."

At the time of the Second Amendment's ratification, only New Jersey had ever prohibited concealed carry; open carry was lawful, except that frontiersmen (only) had to carry long guns rather than handguns. No colony or state had ever prohibited open carry.

In contrast, arms carrying was often mandated, belying the contention that peaceable arms carrying was considered inherently terrifying by the public.

4

When not mandated to carry arms, many Americans—including many Founders—voluntarily carried. The assertion that arms carrying was illegal in America except when it was mandatory is contrary to history.

## ARGUMENT

### I. The Second Amendment's text protects the right to bear arms as emphatically as the right to keep arms.

### A. The Second Amendment's text places "bear" on equal footing with "keep."

The Second Amendment protects both the right to *keep* and the right to *bear* arms. The text does not create a hierarchy of rights; it protects both rights equally. Thus, the Supreme Court held that the Second Amendment "guarantee[s] the individual right to *possess* and *carry* weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008) (emphasis added). Just as law-abiding citizens cannot be prevented from *possessing* arms for self-defense, they cannot be prevented from *carrying* arms for self-defense.[2] Because "the rights to

---

[2] According to *Heller*, the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home"—the particular right Mr. Heller sought to exercise. 554 U.S. at 635. The Court's words have sometimes been misinterpreted as if self-defense in the home were a higher interest than self-defense elsewhere. In fact, the Court was comparing the right to home defense with government interests in banning handgun

keep and bear arms are on equal footing…the law must leave responsible, law-abiding citizens some reasonable means of exercising each." *Wrenn v. District of Columbia*, 864 F.3d 650, 663 (D.C. Cir. 2017).

Had the Founders intended otherwise, they would have worded the Second Amendment differently. As Chief Justice Marshall explained, "the enlightened patriots who framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 188 (1824). The text protects "the right of the people to keep *and bear* Arms." U.S. Const. amend. II (emphasis added).

## B. Contemporary dictionaries defined "bear" to mean "carry."

"Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634-35. "In interpreting [the Second Amendment's] text, we are guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary

---

possession in the home; the Court was not comparing the right to keep arms with the right to bear arms.

as distinguished from technical meaning.'" *Id.* at 576 (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)).

According to *Heller*, "At the time of the founding, as now, to 'bear' meant to 'carry.'" *Id.* at 584. The Court agreed with a definition previously presented by Justice Ginsburg: "[s]urely a most familiar meaning is, as the Constitution's Second Amendment…indicate[s]: 'wear, bear, or carry…upon the person or in the clothing or in a pocket, for the purpose…of being armed and ready for offensive or defensive action in a case of conflict with another person.'" *Id.* (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)).

For the meaning of "bear arms," the Court also looked to leading historical dictionaries. Samuel Johnson defined "Bear" as "To carry as a mark of distinction…So we say, to *bear* arms in a coat." Samuel Johnson, 1 DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 1773) (unpaginated).[3] Similarly, Noah Webster defined "Bear" as "To wear; to *bear* as a mark of authority or distinction; as, to *bear* a sword, a badge, a name; to *bear* arms in a coat." Noah Webster, 1 AMERICAN DICTIONARY OF THE

---

[3] The *Heller* Court relied on Johnson's dictionary to define "arms," 554 U.S. at 581, "keep," *id.* at 582, "bear," *id.* at 584, and "well-regulated," *id.* at 597.

7

ENGLISH LANGUAGE (1828) (unpaginated).[4] Thus, in the definition of *pistol*, Webster explained that "Small pistols are carried in the pocket." 2 *id.* "To bear arms in a coat" (Johnson and Webster) and to "carry…in the clothing or in a pocket" (*Heller* quoting Justice Ginsburg) are indicia of public activity, not confined to the home.

## C. The right to bear arms is not limited to military uses.

*Heller* rejected the notion that "bear arms" exclusively means to bear arms while in military service. 554 U.S. at 581 (citing historical usages), 584-86 (citing state constitution provisions of "bear arms" that included personal self-defense), 599 ("The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting.").

Likewise, Justice Alito's concurrence in *Caetano v. Massachusetts* described Ms. Caetano's drawing a stun gun in a public place, against her violent ex-husband, as an exercise of the Second Amendment's "basic right" of "individual self-defense." 136 S. Ct. 1027, 1028-29 (2016) (Alito,

---

[4] The *Heller* Court relied on Webster's dictionary to define "arms," *id.* at 581, "keep," *id.* at 582, "bear," *id.* at 584, and "militia," *id.* at 595.

J., concurring) (citing *Heller*, 554 U.S. at 599, 628 and quoting *McDonald v. Chicago*, 561 U.S. 742, 767 (2010)).

In this Court, the Supreme Court's determination of the meaning of "bear arms" is conclusive. *See Moore v. Madigan*, 702 F.3d 933, 937 (7th Cir. 2012) ("we are bound by the Supreme Court's historical analysis because it was central to the Court's holding in *Heller*").

Nonetheless, one writer says he has conducted new research conclusively proving that "bear arms" had a military-only connotation. *See* Order Denying Motion of Neal Goldfarb for Leave to Participate in Oral Argument as Amicus Curiae and For Divided Argument, *New York State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 398 (mem.) (Oct. 15, 2019).

But in 1785, while in the Virginia legislature, James Madison—the Second Amendment's author—proposed an anti-poaching law drafted by Thomas Jefferson in 1779. Anyone convicted of killing deer out of season faced further punishment if, in the following year, he "shall bear a gun out of his inclosed ground, unless whilst performing military duty." *A Bill for Preservation of Deer (1785), in* 2 THE PAPERS OF THOMAS JEFFERSON 444 (J. Boyd ed., 1950). The illegal gun carrier would have to return to

court for "every such bearing of a gun" to post an additional good-behavior bond.[5] *Id.* According to the Madison-Jefferson bill, "performing military duty" was but one way to "bear a gun."

Phrases like "bear a gun" or "bear arms" are not military-only just because they are sometimes used near words like "war." In the usage of the time, "war" included personal self-defense.

John Locke, for example, wrote that a criminal who attempts to murder, rob, or put an individual under the criminal's "Absolute Power, does thereby *put himself into a State of War* with him." In response, the defender "may destroy a Man who makes War upon him…for the same Reason, that he may kill a Wolf or a Lion." John Locke, SECOND TREATISE OF GOVERNMENT §§16-18 (1690).

Locke's description of self-defense as "war" followed other eminent philosophers' usage. In the most influential international law treatise of all time, Hugo Grotius explained:

> if a Man is assaulted in such a Manner, that his Life shall appear in inevitable Danger, he may not only make War upon, but very justly destroy the Aggressor; and from this Instance

---

[5] The bill forbade carrying only long guns, not other arms, such as pistols. In the usage of the time, "one species of fire-arms, the pistol, is never called a *gun*." 1 Webster, *supra*, (defining *gun*).

> which every one must allow us, it appears that such a private
> War may be just and lawful.

Hugo Grotius, 2 THE RIGHTS OF WAR AND PEACE 397 (Richard Tuck ed., 2005) (1625). Likewise, "What we have hitherto said, concerning the Right of defending our Persons and Estates, principally regards private Wars; but we may likewise apply it to publick Wars, with some Difference." *Id.* at 416 (defensive private and public war are both morally permissible; public war may be undertaken for "revenging and punishing Injuries," but private war may not).[6]

In the sixteenth century, the leading scholar and exponent of international law was Spanish professor Francisco de Victoria. As he put it, "Any one, even a private person, can accept and wage a defensive war. This is shown by the fact that force may be repelled by force. Hence, any one can make this kind of war, without authority from any one else, for the defense not only of his person, but also of his property and goods." Francisco De Victoria, 2 DE INDIS ET DE IURE BELLI RELECTIONES 167 (Ernest Nys ed., John Pawley Bates trans., 1995) (1532).

---

[6] For background on Grotius and the other writers discussed in the remainder of this Part, *see* David Kopel, Paul Gallant & Joanne Eisen, *The Human Right of Self-Defense*, 22 BYU J. PUB. L. 43 (2008).

Decades later, another leading Spanish professor, Francisco Suárez, articulated the self-defense philosophy that would be popularized in the English-speaking world by writers such as John Locke: "I hold that defensive war not only is permitted, but sometimes is even commanded. This first part of this proposition…holds true not only for public officials, but also for private individuals, since all laws allow the repelling of force with force. The reason supporting it is that the right of self-defence is natural and necessary." Francisco Suárez, DE TRIPLICI VIRTUTE THEOLOGICA, FIDE, SPE, ET CHARITATE (1621) (On the Three Theological Virtues, Faith, Hope, and Charity), *in* 2 SELECTIONS FROM THREE WORKS OF FRANCISCO SUÁREZ, S.J. 802-03 (Gwladys Williams ed., 1944) (Disputation 13, §1.4).

Swiss professor Jean-Jacques Burlamaqui was the first to declare a natural right to pursue happiness. His writings much influenced the American Founders. Burlamaqui argued that personal defense is essential to preservation of peaceful society, "otherwise the human species would become the victims of robbery and licentiousness: for the right of making war is, properly speaking, the most powerful means of maintaining peace." Jean-Jacques Burlamaqui, 2 THE PRINCIPLES OF

NATURAL AND POLITIC LAW 224 (Thomas Nugent trans., 2d ed. 1763) (1747 & 1751) (Pt. IV, ch. 1, ¶11); *see also* Samuel Pufendorf, *Of the Right of War*, *in* OF THE LAW OF NATURE AND NATIONS 832-33 (The Lawbook Exchange 2005) (1672) (bk. 8, ch. 6, §§1-2) (Chapter on rights of war, recapitulating rules for the natural right of personal self-defense, and then extrapolating to create humanitarian rules for international warfare—such as against attacking noncombatants or executing prisoners-of-war).

In sum, being prepared for defensive war included bearing arms for individual defense. "Bear arms" was not limited to weapons carriage in military service while engaging in public war.

This founding-era understanding of "bear arms" was well recognized by the ratifiers of the Fourteenth Amendment, through which the right to bear arms applies to the States. *McDonald*, 561 U.S. 742. The same Congress that voted for the Fourteenth Amendment passed the Freedmen's Bureau Act, which provided:

> the right…to have full and equal benefit of all laws and proceedings concerning personal liberty, personal security…including the constitutional right to bear arms, shall be secured to and enjoyed by all the citizens of such State or district without respect to race or color or previous condition of slavery.

13

Act of July 16, 1866, §14, 14 Stat. 176-77. As *McDonald* recognized, "the constitutional right to bear arms" protected by the Act was "an unmistakable reference to the right protected by the Second Amendment." 561 U.S. at 779. And it was explicitly identified as "concerning personal liberty, personal security"—undoubtedly describing an individual, nonmilitary right.

## II.  The right of law-abiding citizens to carry arms in public was unrestricted throughout the colonial and founding eras.

Supporting the rights of American merchant vessels to arm themselves against French attack, Rep. Harrison Gray Otis wrote: "The law of Nature and of Nations authorize the right of carrying arms for self defence, by sea as well as by land, and no law of the United States has ever prohibited to our citizens the exercise of this right." Letter from the Hon. Harrison G. Otis, to the Hon. William Heath, as Chairman of the Roxbury Committee, for Petitioning Congress, Against Permitting Merchant Vessels to Arm 11 (Apr. 1798).[7]

---

[7] https://books.google.com/books?id=sqfYkg7_UokC&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q&f=false.

Throughout the colonial and founding eras, only one colony enacted a broad statutory restriction on bearing arms by law-abiding citizens. In 1686, New Jersey outlawed the concealed carry of "any Pocket Pistol, Skeines [Irish-Scottish dagger], Stilladoes, Daggers or Dirks, or other unusual or unlawful Weapons." The statute also forbade any "Planter" (frontiersman) to "Ride or go Armed with Sword, Pistol, or Dagger," except when in government service. The statute excepted "Strangers, Travelling upon their lawful Occasions through this Province, behaving themselves peaceably." 23 THE GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE PROVINCE OF NEW-JERSEY 289-90 (1758); Richard Lederer, Jr., COLONIAL AMERICAN ENGLISH 175 (1985) (defining "planter" as "One of those who settled new and uncultivated territory").

The most severe—by far—pre-Second Amendment restriction thus allowed all colonists to carry long guns in any manner, openly or concealed. Further, all colonists except frontiersmen could carry pistols openly.

According to *Heller*, laws prohibiting open carry of handguns were among the most severe firearm restrictions in our nation's history:

> Few laws in the history of our Nation have come close to the severe restriction of the District's handgun ban. And some of

those few have been struck down. In *Nunn v. State,* the Georgia Supreme Court struck down a prohibition on carrying pistols openly (even though it upheld a prohibition on carrying concealed weapons). In *Andrews v. State,* the Tennessee Supreme Court likewise held that a statute that forbade openly carrying a pistol "publicly or privately, without regard to time or place, or circumstances," violated the state constitutional provision (which the court equated with the Second Amendment). That was so even though the statute did not restrict the carrying of long guns.

554 U.S. at 629 (citations omitted). The carry restrictions were specifically identified by the Court as comparable in severity to the District of Columbia's handgun ban, which was unconstitutional "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Id.* at 628.

## III. Throughout the colonial and founding eras, citizen arms carrying was ordinary, not "terrifying."

The common law and related statutes forbade carrying arms "to the terror of the people." *E.g.* George Webb, THE OFFICE AND AUTHORITY OF A JUSTICE OF PEACE 92 (1736) (constable "may take away Arms from such who ride, or go, offensively armed, in Terror of the People"). Defendants' *amici* contend that in Early America, the sight of someone carrying a gun was inherently terrifying. From this supposition, they conclude that peaceable carry of ordinary arms was prohibited.

16

The idea that arms carrying was inherently terrifying to the American public is implausible. To begin with, the colonies and states all required militiamen (typically, males aged 16 to 60) regularly to carry arms in public to attend musters. *See* David Kopel & Joseph Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U.L.J. 495 (2019) (describing all colonial and founding era militia statutes).

Additionally, as *Heller* noted, "Many colonial statutes required individual arms-bearing for public-safety reasons." 554 U.S. at 601. These requirements were often unrelated to militia service, including the following examples.

## A. Virginia

America's first legislative assembly, the Virginia House of Burgesses, mandated bringing guns to church: "All persons whatsoever upon the Sabaoth daye shall frequent divine service both forenoon and afternoon, and all suche as beare armes shall bring their pieces, swordes, poulder and shotte." Proceedings of the Virginia Assembly, 1619, *in* Lyon Gardiner Tyler, NARRATIVES OF EARLY VIRGINIA, 1606-25, at 273 (1907).[8]

---

[8] https://archive.org/details/narrativesofearl1946tyle/page/272/mode/2up/search/armes.

17

A 1623 law addressed travel: "That no man go or send abroad without a sufficient partie will armed." William Waller Hening, 1 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA 127 (1809). Farmers were also covered: "That men go not to worke in the ground without their arms (and a centinell [sentinel] upon them)." *Id.* New laws in 1632 restated the duties to carry arms to church, during travel, and in the fields. *Id.* at 173, 198. The church mandate was narrowed to heads of households in 1643. *Id.* at 263.

The 1665 legislature worried about "the careless Manner" of people "going unarmed to Churches, Courts, and other public Meetings," and requested that the governor instruct militia officers "to take care and prevent the same." VIRGINIA LAWS 1661-1676, at 37 (1676).[9] Then in 1676, the legislature stated that "in goeing to churches and courts in those tymes of danger, all people be enjoyned and required to goe armed for their greate security." *Id.* at 681.

## B. Massachusetts Bay

In 1637, Massachusetts Bay required persons over 18 to "come to the publike assemblies with their muskets, or other peeces fit for servise,

---

[9] Available on HeinOnline.

furnished with match, powder, & bullets." 1 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 190 (1853).

Starting in 1631, colonists from Massachusetts could not travel to next-door Plymouth Colony "without some armes." *Id*. at 85. A 1636 statute covered travel generally: "no person shall travell above one mile from his dwelling house, except in places wheare other houses are neare together, without some armes, upon paine of 12d. [pence] for every default." 1 *id*. at 190. In 1643, each town's highest-ranking militia officer was ordered to "appoint what armes to bee brought to the meeting houses on the Lords dayes, & other times of meeting." 2 *id*. at 38 (1853); 1 *id*. at 190.

## C. Plymouth

In the Plymouth Colony, militiamen had to bear arms to church on Sundays, and sometimes to practice with their firearms after church. Starting in 1656, the mandate applied from April 1 through November 30. THE COMPACT WITH THE CHARTER AND LAWS OF THE COLONY OF NEW PLYMOUTH 102 (1836). The mandate was expanded to March 1 in 1658 and became year-round in 1675. *Id*. at 115, 176.

### D.  Connecticut

In 1643, Connecticut required that every house with a militiaman send one armed man to every church meeting: "It is Ordered, that one person in every several howse wherein is any souldear or souldears, shall bring a musket, pystoll or some peece, with powder and shott to e[a]ch meeting." 1 PUBLIC RECORDS OF THE COLONY OF CONNECTICUT 95-96 (1850). The nearby New Haven Colony passed a similar law. RECORDS OF THE COLONY AND PLANTATION OF NEW HAVEN, FROM 1638 TO 1649, at 131-32 (1857).

### E.  Rhode Island

In 1639, Rhode Island ordered that "noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword; and that none shall come to any public Meeting without his weapon." 1 RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND 94 (1856). Portsmouth enacted a parallel law in 1643. *Id.* at 79.

### F.  Maryland

Maryland's church and travel mandates were enacted in 1642: "Noe man able to bear arms to goe to church or Chappell or any considerable

20

distance from home without fixed gunn and 1 Charge at least of powder and Shott." 3 ARCHIVES OF MARYLAND 103 (1885).

### G. South Carolina

Beginning in 1740, any churchgoing militiaman had to "carry with him a gun or a pair of horse-pistols…with at least six charges of gunpowder and ball." Church officials were ordered to report persons who failed to bring arms to church, and they were authorized to require parishioners to display their arms. David McCord, 7 STATUTES AT LARGE OF SOUTH CAROLINA 417-19 (1840).

### H. Georgia

"[F]or the security and *defence of this province* from internal dangers and insurrections," a 1770 Georgia law fined militiamen who attended church unarmed. 19 (pt. 1). THE COLONIAL RECORDS OF THE STATE OF GEORGIA 137-40 (1904).

Defendants' *amici* contend that none of the above types of arms carrying were terrifying to the public because they were mandated by the government. It is unlikely that Americans were perfectly comfortable seeing their neighbors carrying guns on the way to public meetings or when traveling a mile or two from home—but were terrified upon seeing

those same neighbors carrying the same guns when traveling a half-mile from home.

## IV. The Founders regularly carried arms in their everyday lives.

Defendants' *amici* contend that arms carrying by choice (rather than by government mandate) was forbidden. The Founding generations apparently did not agree, for they voluntarily carried arms routinely for defense and sport.

### A. John Adams

Along with riding equipment such as a bridle, straps, and riding pad, Adams purchased a pair of pistol bags, to be armed on horseback. 2 DIARY AND AUTOBIOGRAPHY OF JOHN ADAMS 165 (1961). When Adams sailed to France on a diplomatic mission, he carried a "pocket-sized pistol." David McCullough, JOHN ADAMS 177 (2001). As a 9- or 10-year-old schoolboy, Adams carried a gun daily so that he could go hunting after class. 3 DIARY AND AUTOBIOGRAPHY OF JOHN ADAMS 257-59 (1961).

### B. Thomas Jefferson

Jefferson wrote to his fifteen-year-old nephew about the best exercise: "I advise the gun. While this gives a moderate exercise to the body, it gives boldness, enterprize, and independance to the mind….Let your gun

22

therefore be the constant companion of your walks." 8 THE PAPERS OF THOMAS JEFFERSON 407.[10]

In 1803, President Jefferson wrote from the White House to Rep. Thomas Randolph: "I left at Orange C.H. one of my Turkish pistols, in it's holster, locked. I shall be glad if either yourself or mr Eppes can let a servant take it on to this place [the White House]." 41 *id.* at 485. Jefferson then wrote to the innkeeper where he left the pistol, asking him to deliver it when Randolph or Rep. John Eppes came for it. *Id.* at 486.[11]

In 1816, Jefferson gifted the Turkish pistols to John Payne Todd. Jefferson told Todd that he made a holster for one pistol on his saddle pommel, plus holsters "to hang them at the side of my carriage for road use." 10 THE PAPERS OF THOMAS JEFFERSON, RETIREMENT SERIES 320-21 (2004).[12]

## C. James Monroe

The future president enrolled at the Campbell Academy in 1766, when he was 11 years old. Every day, "[w]ell before dawn, James left for school,

---

[10] https://founders.archives.gov/documents/Jefferson/01-08-02-0319.

[11] https://founders.archives.gov/documents/Jefferson/01-41-02-0365.

[12] https://founders.archives.gov/documents/Jefferson/03-10-02-0206.

carrying his books under one arm with his powder horn under the other and his musket slung across his back." Tim McGrath, JAMES MONROE: A LIFE, Kindle loc. 244 (2020).

### D. Ira Allen and Ethan Allen

Ira Allen and Ethan Allen were Vermont's most influential Founders. From 1776 to 1786, "few if any state papers of Vermont were issued that [Ira] did not prepare or assist in preparing." J. Wilbur, 1 IRA ALLEN: FOUNDER OF VERMONT, 1751-1814, at 87 (1928).

The Allen brothers carried multiple firearms. In 1772 Ira, Ethan, and a cousin went to purchase land near New York's border—disputed territory because New York claimed to own Vermont. The three travelers were, in Ira's words, "armed with holsters and pistols, a good case of pistols each in our pockets, with each a good hanger...." *Id.* at 39. A "case of pistols" was a matching pair of handguns sold together; each man carried handguns plus a sword.

The next year, during land disputes between the Allen trio and the Royal Governor of New York, Ira wrote that the three men "never walked out without at least a case of pistols." *Id.* at 44. So, when Ira surveyed a

24

road with Isaac Vanornam, "I took…my pistols for defence against Yorkers." *Id.* at 42.

One year later, in 1774, New York's Royal Governor placed a bounty on Ethan Allen's head. Ethan and his friend Eli Roberts encountered a dozen British soldiers in a tavern. "[T]hat he and Roberts had each a gun and a case of pistols" (one long gun plus two handguns) seemingly deterred any attack by the soldiers before Allen and Roberts were able to escape out a window. Ira Allen, NATURAL AND POLITICAL HISTORY OF THE STATE OF VERMONT 43-44 (1798).

### E. Joseph Warren

Dr. Joseph Warren, the Patriot leader who organized the Midnight Rides of Paul Revere and William Dawes, was targeted by the British as tensions rose in April 1775. After spotting the British watch one evening, one of Warren's friends "advised Warren not to visit his patients that evening. But Warren, putting his pistols in his pocket, replied, 'I have a visit to make to Mrs.—, in Cornhill, this evening, and I will go at once:

come with me.'" Richard Frothingham, LIFE AND TIMES OF JOSEPH WARREN 452 (1865).[13]

### F. William Drayton

Before serving as a delegate for South Carolina in the Continental Congress, William Drayton served on South Carolina's Committee of Safety, for which he traveled throughout the colony in 1775 to cultivate support for the Patriot cause. At one stop, Moses Kirkland, a Tory, "was on the point of assaulting Mr. Drayton." Had he done so, it "would have brought on bloodshed," because "Mr. Drayton always had about his person, a dirk and a pair of pocket pistols; for the defence of his life." 3 AMERICAN ARCHIVES, 4th ser., at 258 (Peter Force ed., 1840).

### G. General Population

Ordinary citizens carried arms. British Captain Thomas Preston—commander of the unpopular Redcoats who had been stationed in Boston—noted the admonition of a trial judge: being "most thoroughly acquainted with the people and their intentions," the judge stated "that the inhabitants carried weapons concealed under their clothes, and

---

[13] https://archive.org/details/lifeandtimesjos01frotgoog/page/n542/mode/2up.

would destroy them [Redcoats] in a moment, if they pleased." THE ANNUAL REGISTER, OR A VIEW OF THE HISTORY, POLITICS, AND LITERATURE, FOR THE YEAR 1766, at 215 (4th ed., 1785).

Lawyer, professor, and judge St. George Tucker wrote "the most important early American edition of Blackstone's Commentaries." *Heller*, 554 U.S. at 594. Tucker contrasted the American and English laws of treason. In England, a mere assembly of several armed men created a rebuttable presumption of treason. But there was no "such presumption in America, where the right to bear arms is recognized and secured in the constitution itself. In many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side." St. George Tucker, 5 BLACKSTONE'S COMMENTARIES, App'x B, 19 (1803).

The claim that Americans interpreted their statutes and the common law to prohibit voluntary and peaceable arms bearing for self-defense or other lawful purposes is ahistorical.

27

## CONCLUSION

The district court's decision should be reversed, and Hawaii's carry prohibition held unconstitutional.

Respectfully submitted,

/s/ *Joseph G.S. Greenlee*
JOSEPH G.S. GREENLEE
  *Counsel of Record*
FIREARMS POLICY COALITION
1215 K Street, 17th Floor
Sacramento, CA 95814
(916) 378-5785
jgr@fpchq.org

DAVID B. KOPEL
INDEPENDENCE INSTITUTE
727 East 16th Avenue
Denver, CO 80203
(303) 279-6536
david@i2i.org

ILYA SHAPIRO
TREVOR BURRUS
CATO INSTITUTE
1000 Mass. Ave. NW
Washington, DC 20001
(202) 842-0200
ishapiro@cato.org

## APPENDIX

**Randy E. Barnett** is the Carmack Waterhouse Professor of Legal Theory at the Georgetown University Law Center and is Director of the Georgetown Center for the Constitution. He is the author of 12 books, including the textbook *Constitutional Law: Cases in Context* (3rd ed. 2018). Among the cases he has litigated are *NFIB v. Sebelius* and *Gonzales v. Raich*. His scholarship has been cited by the D.C., Third, Sixth, Seventh, Ninth, and Eleventh Circuits; the supreme courts of New Jersey, Oklahoma, Oregon, Washington, and Wisconsin; and federal district courts in six states.

**Royce de R. Barondes** is the James S. Rollins Professor of Law at the University of Missouri School of Law. He teaches firearms law and business law. His research on firearms law is published by the *Houston Law Review* and University of Virginia *Journal of Law & Politics*.

**Robert J. Cottrol** is the Harold Paul Green Research Professor of Law at George Washington. His scholarship was cited in Justice Thomas's concurring opinions in *McDonald v. Chicago* and *Printz v. United States*, and by the Fourth Circuit in *Kolbe v. Hogan*, 849 F.3d 114 (2017) (Traxler, J., dissenting). Prof. Cottrol is author of four legal history

books on race and law, and editor of a three-volume anthology of the right to arms. He wrote the entries for "The Right to Bear Arms" in *The Oxford International Encyclopedia of Legal History* and "The Second Amendment" in *The Oxford Companion to the Supreme Court of the United States*. His Second Amendment scholarship has been published in the *Yale Law Journal*, *Georgetown Law Journal*, and *Journal of American Legal History*.

**Nicholas J. Johnson** is a Professor of Law at Fordham University, School of Law. He is co-author of the first law school textbook on the Second Amendment, *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* (Aspen Pub. 2d ed. 2017) (with David B. Kopel, George A. Mocsary, and Michael P. O'Shea). The casebook has been cited by majorities in *People v. Chairez* (Supreme Court of Illinois) and *Grace v. District of Columbia* (D.C. Cir.), and by dissents in *Drake v. Filko* (3d Cir.) and *Heller II* (D.C. Cir.) (Kavanaugh, J., dissenting). Professor Johnson is also author of *Negroes and the Gun: The Black Tradition of Arms* (2014). His articles on the right to arms have been published by the *Hastings Law Review*, *Ohio State Law Journal*, and *Wake Forest Law Review*. Other courts citing his right to arms

scholarship include the Seventh Circuit, Eastern District of New York, and Washington Court of Appeals.

**Donald E.J. Kilmer, Jr.** is an Adjunct Professor of Constitutional Law at Lincoln University Law School, where his courses include Second Amendment and Firearms Law. His analysis of post-*Heller* litigation was published in a symposium of the *Georgetown Journal of Law & Public Policy*.

**Joyce Malcolm** is the Patrick Henry Professor of Constitutional Law and the Second Amendment at George Mason University, Antonin Scalia Law School. She is author of seven books on British and American history, most notably *To Keep and Bear Arms: The Origins of an Anglo-American Right* (Harvard Univ. Pr. 1994). The book was cited by the majority opinions in *District of Columbia v. Heller* and *McDonald v. City of Chicago*, by Justice Thomas's concurrence in *Printz v. United States*, and by the D.C., Fourth, and Ninth Circuits; by federal district courts in Oregon, Pennsylvania, Texas, and West Virginia; and by the Oregon Supreme Court, Oregon Court of Appeals, and Washington Supreme Court.

**George A. Mocsary** is Professor of Law at the University of Wyoming College of Law. He is co-author of the textbook *Firearms Law and the Second Amendment*, described more fully in conjunction with Professor Johnson. His articles have appeared in the *George Mason Law Review*, *Connecticut Law Review*, and *Duke Law Journal Online*. His Second Amendment scholarship was cited in *McDonald v. Chicago*, and in the Fourth and Seventh Circuits.

**Joseph E. Olson** is an emeritus Professor of Law at Mitchell Hamline School of Law, where he taught Second Amendment, business law, and tax law. His scholarship on the right to arms was cited by *District of Columbia v. Heller*, and also by the Ninth Circuit, Eastern District of New York, and Washington Supreme Court. His articles on the right have appeared in the *Stanford Law and Policy Review*, *Georgetown Journal of Law & Public Policy*, and *Michigan Journal of Law Reform*.

**Glenn H. Reynolds** is the Beauchamp Brogan Distinguished Professor of Law at the University of Tennessee College of Law, where he teaches constitutional law and technology law. His constitutional scholarship has been published in the *Columbia Law Review*, *Virginia Law Review*, *University of Pennsylvania Law Review*, *Wisconsin Law*

*Review*, and *Northwestern University Law Review*. The Seventh Circuit cited his scholarship as a model of "originalist interpretive method as applied to the Second Amendment." *Ezell v. City of Chicago*, 651 F.3d 684, 699 n.11 (7th Cir. 2011). In addition, his right-to-arms scholarship has been cited by the First, Third, Fourth, Fifth, Seventh, Eighth, and Ninth Circuits; by federal district courts in Wisconsin, Illinois, and Texas; and by the Supreme Courts of Kentucky and Oregon.

**E. Gregory Wallace** is a Professor of Law at Campbell University School of Law, where his constitutional law courses include a course on the Second Amendment. He recently published an article on "Assault Weapon" Myths in the *Heller* symposium issue of the *Southern Illinois Law Journal*. He has spoken on Second Amendment issues in various law school symposia and recently supervised the Campbell Symposium on the tenth anniversary of the *Heller* decision. He is co-author of forthcoming online supplemental chapters in the Johnson, et al., *Firearms Law* textbook.

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Circuit Rule 29-2(c)(3) and this Court's Orders because this brief contains 4,998 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point, proportionately spaced Century Schoolbook font.

Dated this 4th day of June 2020.

/s/ *Joseph G.S. Greenlee*
Joseph G.S. Greenlee
*Counsel of Record*

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2020, I served the foregoing brief via the CM/ECF system for the United States Court of Appeals for the Ninth Circuit, which will distribute the brief to all attorneys of record in this case. No privacy redactions were necessary.

Dated this 4th day of June 2020.

/s/ *Joseph G.S. Greenlee*
Joseph G.S. Greenlee
*Counsel of Record*